UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

100 BANK, LLC,

       Plaintiff,

    v.                                    Case No. 2:21-cv-00154-wks[1]

BTC MALL ASSOCIATES, LLC; CITY OF
BURLINGTON; THE BURLINGTON
DEVELOPMENT REVIEW BOARD; CAITLIN
HALPERT, in her official capacity; BROOKS
MCARTHUR, in his official capacity; SEAN
MCKENZIE, in his official capacity; BRADFORD
L. RABINOWITZ, in his official capacity;
HARRIS SPRINGER, in his official capacity;
SCOTT GUSTIN, in his official capacity,

       Defendants

   And

BRADLEY M. BIGGIE, in his official capacity;
and KIM IANELLI, in her official capacity,

       Relief Defendants.

**THE CITY DEFENDANTS'
MOTION TO DISMISS
PLAINTIFF 100 BANK'S COMPLAINT**

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and Local Rule 7, the City of

Burlington, the Burlington Development Review Board ("DRB"), Caitlin Halpert, in her official

capacity; Brooks McArthur, in his official capacity; Sean McKenzie, in his official capacity;

Bradford L. Rabinowitz, in his official capacity; Harris Springer, in his official capacity ("DRB

---

[1] On June 9, 2021, 100 Bank filed a virtually identical case in Vermont Superior Court, Civil Division, Chittenden Unit. A copy of that Complaint (the "State Court Action") is attached as **Exhibit A**.

Downs
Rachlin
Martin PLLC

Board Members"); Scott Gustin, in his official capacity;[2] Bradley M. Biggie, in his official

capacity;[3] and Kim Ianelli, in her official capacity[4] ("City employees") (collectively "The City

Defendants"), hereby move to dismiss Plaintiffs' Complaint.

Plaintiff's case rests on the logical fallacy that it has been deprived of a property interest

by the DRB—a body undeniably lacking condemnation authority—by virtue of the DRB's

March 8, 2021 approval of the Amendment to BTC's 2017 Zoning Permit (17-0662CA/MA) for

the mixed use redevelopment of the former Burlington Town Center mall site (the "Cityplace

Project"). 100 Bank undisputedly owns fractional property within the Cityplace Project's

proposed public through-street extension of Pine Street (the "Pine Street Extension"). This

component of the Cityplace Project, widely referred to as the Public Improvements, encompasses

far more than 100 Bank's property and has been part-and-parcel of the project since its inception

in 2017. 100 Bank has been an active participant in the overall project in numerous forums.

As a matter of law, the issuance of a permit does not effectuate a taking for which

Plaintiff can seek compensation or allege violations under the Vermont [5] and United States

Constitutions. See e.g. Devonwood Investors, LLC 75 Cherry Street, Docket No. 39-4-17 Vtec,

2017 WL 11272330, *4 (Vt. Envtl. Ct. May 22, 2017) (Walsh, J.) ("[A] permit applicant need

not own the land on which the proposed use takes place. Nothing in the state zoning law

requires the applicant to also be the landowner.") (citing Clermont Terrace Site Plan and Zoning

Permit Approvals, Nos. 46-2-05 Vtec (Vt. Envtl. Ct. Mar. 22, 2006) (Durkin, J.) ("applications

---

[2] Mr. Gustin is employed by the City in the role of Principal Planner for Development Review, Zoning Manager, and Assistant Administrated Zoning Officer.

[3] Mr. Biggie is employed by the City in the role of Building Inspector.

[4] Ms. Ianelli is employed by the City in the role of Building Inspector.

[5] In addition to this case, and instead of asserting claims under supplemental jurisdiction in this case, Plaintiff simultaneously filed a parallel action in state court alleging claims under the Vermont state constitution analogs to the U.S. Constitution.

Downs
Rachlin
Martin PLLC

for municipal permits to develop property are often filed by individuals who do not hold record title to the subject property.")).

Moreover, the City Defendants have no plans to develop 100 Bank's property without first acquiring from 100 Bank the right to do so. No condemnation proceeding has been initiated. Instead, the parties are engaged in discussions as to the terms of the City acquiring the necessary rights to the subject property. Accordingly, Plaintiff's takings claim under the Fifth Amendment, including the allegations of violations of due process, must be dismissed on ripeness grounds for lack of finality regarding the property at issue. In further support of their Motion to Dismiss, the City Defendants submit the following Memorandum of Law.

<u>MEMORANDUM OF LAW</u>

I.    FACTUAL AND PROCEDURAL BACKGROUND

This case concerns the DRB's March 2017 approval of BTC's Burlington Town Center Redevelopment Plans, as amended by the DRB in Findings of Fact on March 8, 2021 ("DRB Findings"). Compl. ¶ 48. 100 Bank owns property on and near where the building at 100 Bank Street, Burlington, is located. <u>Id.</u> ¶ 83. A portion of 100 Bank's property is within the proposed public through-street extension of Pine Street, which is intended to restore connectivity of the urban grid consistent with the objectives of the City's 2013 community plan "*planBTC-Downtown & Waterfront Master Plan*" ("PlanBTV"). <u>See</u> Compl. ¶¶ 63-65, 68.

**A. The CityPlace Project and The Public Improvements**

The CityPlace Project is a multi-use project within downtown Burlington on the site of the former Burlington Town Center Mall. Defendant BTC owns several parcels of property within the project area, including the parcels that were improved with the former mall. The City

also owns certain property, including a public right of way, within the project site.  DRB

Findings at 1, 5, **Exhibit B**.[6]

While the mall originally expanded the retail base of the City's downtown, for several

years it had been a chronic underperformer economically.  The site is also a barrier to the north-

south City grid connectivity by eliminating the north-south segments of St. Paul Street and Pine

Street between Bank Street and Cherry Street and precluding the growth of vibrant street life on

Bank Street and Cherry Street.  See Compl. ¶¶ 63-64.

Over the next several years, the City and members of the broader City community had the

opportunity to offer input and refine the proposal for developing the Burlington Town Center,

including numerous public meetings (the "Public Process").[7]  For example, on January 8, 2015, a

"kick-off" meeting was held at City Hall to solicit, receive, and incorporate public input

regarding the community's issues and concerns.  A City webpage was established as a portal for

public comment and project-related information.[8]  A community planning workshop followed on

February 18-21, 2015.[9]  Additional follow-up presentations were made to the community

highlighting the ways in which the proposed redevelopment responded to community feedback.

---

[6] In resolving a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), the Court may consider the DRB Findings and other evidence outside the pleadings.  See Makarova v. United States, 201 F.3d 110 (2d Cir. 2000).  Even under the more narrow 12(b)(6) standard of review, the DRB findings are properly considered in deciding a motion to dismiss for failure to state a claim, because the document is incorporated by reference in the Complaint, forms the basis for the Complaint, and the Complaint relies upon its terms.  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

[7] "A public process to create, review and approve a development agreement between the City and the BTC Mall was approved by City Council in December 2014."  https://www.burlingtonvt.gov/CEDO/Public-Process (last visited July 4, 2021). A summary of the public process can be found here: https://www.burlingtonvt.gov/sites/default/files/CEDO/Files/btvmall/BTV%20Mall%20Public%20Process%20Summary_May206.pdf (last visited July 4, 2021).

The Court can take judicial notice of the Public Process and consider this matter on a motion to dismiss.  See Chambers, 282 F.3d at 153; F.R.E. 201.

[8] https://www.burlingtonvt.gov/CEDO/Project-Documents2 (last visited July 4, 2021).
[9] https://www.burlingtonvt.gov/CEDO/Community-Engagement2 (last visited July 4, 2021).

Re-connectivity of the grid, including the Pine Street corridor, was a significant component of the development concept from day one.

On March 17, 2017, the DRB unanimously approved BTC's application.[10]  The DRB approval followed approvals from the City's Conservation Board and Design Advisory Board earlier in 2017.  The March 2017 Approved Redevelopment Plans depicted the reconnected Pine Street adjacent to the building at 100 Bank Street:



Sheet LA-500.[11]

On October 26, 2017, the City and BTC entered into a Development Agreement, as amended by Letter Agreement dated August 27, 2018, and fully executed on September 7, 2018 (as amended, the "Original Development Agreement").[12]  The Original Development Agreement

---

[10] Id.

[11] https://www.burlingtonvt.gov/sites/default/files/CEDO/BurlingtonTownCenter/BTC%202017_04_04%20Comprehensive_Zoning_Submission.pdf at 23 (last visited July 4, 2021).

[12] https://www.burlingtonvt.gov/CEDO/Project-Documents (last visited July 4, 2021).

Downs
Rachlin
Martin PLLC

5

categorized the Project elements as either "Public Improvements" or "Private Improvements." The "Public Improvements" are defined as the re-establishment of St. Paul Street, the re-establishment of Pine Street, and the activation of Bank and Cherry Streets (as more particularly described in that Agreement).[13]  The balance of the Project elements were defined as "Private Improvements." [14]  BTC subsequently demolished certain portions of the former Burlington Town Center in 2018, but did not perform any construction activity on the project property since that time.  See Compl.  ¶ 55.

In 2021, BTC requested approval from the DRB to modify the redevelopment plans for the Cityplace Project.[15]  To facilitate BTC's development of the Cityplace Project, BTC and the City entered into an Amended and Restated Development Agreement.[16]  The Amended and Restated Development Agreement does not materially differ from the Original Agreement with respect to the Pine Street Public Improvement.  Moreover, the Amended and Restated Development Agreement expressly contemplates that the City will acquire the necessary rights from 100 Bank to construct the Public Improvements.[17]

---

[13] https://www.burlingtonvt.gov/sites/default/files/BTC%20Mall%20Development%20Agreement%20-%20Executed%20%28without%20Exhibits%29.pdf (last visited July 4, 2021).

[14] Id.

[15] Prior to this, the City and BTC were engaged in a dispute over the CityPlace Project, in particular BTC's failure to construct the Public Improvements, e.g. connecting Pine and St. Paul Streets. Compl. ¶¶ 56, 60.  100 Bank was aware of this dispute.  That dispute has since been resolved and is not germane to the current case.

[16] Plaintiff is confused as to the difference between obligations in a "settlement" and obligations that flow from the Amended and Restated Development Agreement (which for the purpose of this dispute are not materially different from those commitments the City assumed in the 2017 Development Agreement).  The City's commitments referenced by Plaintiff in the Complaint are those that come from the Amended and Restated Development Agreement.

[17] Plaintiff's Complaint is intentionally confusing by not following a chronological timeline.  Plaintiff would have this court believe that the planned reconnection of downtown Burlington and conveyance of the streets to the City (Pine Street and St. Paul Street) resulted from the 2020 litigation between the City and BTC.  See Compl. ¶¶ 62, 65-66.  That is inaccurate, and BTC has been aware of this plans for almost four years.

In 2017, BTC and the City agreed that BTC would "convey to the City and the City shall acquire from Owner fee simple title to the segments of St. Paul Street and Pine Street." https://www.burlingtonvt.gov/sites/default/files/BTC%20Mall%20Development%20Agreement%20-%20Executed%20%28without%20Exhibits%29.pdf at 24.

Downs
Rachlin
Martin PLLC

On March 8, 2021, the DRB approved the revised project plans.  **Exhibit B**.  The revised

plans reduced the footage by approximately 25% and building height by 50 feet; replaced certain

office use with additional residential units; increased the square footage of housing and number

of residential units; and eliminated the hotel use.  Id. at 5.

B.  **The Abandonment Letter And The Application To Amend The March 17, 2017 Permit.**

On September 3, 2020, BTC sent a letter to the City/DRB stating that it was

"abandon[ing], withdraw[ing] and relinquish[ing]" the March 17, 2017 DRB permit (the

"Abandonment Letter").  Compl. ¶ 23.  The Abandonment Letter was not a development review

application under the City's Comprehensive Development Ordinance ("CDO") or the Vermont

Planning and Development Act of Title 24 (24 V.S.A. §§ 4301-98).

On September 14, 2020, Scott Gustin sent an email to BTC that rejected BTC's attempt

to abandon the permit, given that the permit had already been acted upon by BTC.  Compl. ¶ 26.

Mr. Gustin's email stated:

> I've reviewed your request submitted below and have conferred
> with other pertinent city staff.  Zoning permit 17-0662CA/MA,
> issued for the mixed use redevelopment of the mall, cannot be
> relinquished because it was released and acted on, at least in part
> (i.e. demolition of the rear portion of the mall).  In the event that a
> new zooning permit is approved for redevelopment of the site and
> acted on, that new zoning permit could superseded 17-
> 0662CA/MA.

September 14, 2020 Email, from Scott Gustin to Donald Sinex and BTC Counsel, attached as

**Exhibit C** (the "September 14, 2020 Email").[18]

---

[18] https://www.burlingtonvt.gov/sites/default/files/Agendas/SupportingDocuments/75%20cherry059753%20%281%29.pdf (last visited July 4, 2021).

Downs
Rachlin
Martin PLLC

Mr. Gustin's September 14, 2020 Email was not an action requiring notice under the

Vermont Planning and Development Act.  On September 28, 2020,[19] BTC filed an appeal

("Abandonment Appeal") with the DRB of Mr. Gustin' September 14, 2020 rejection.  Compl. ¶

30.  The Abandonment Appeal and supplemental filings are posted on and noticed on the DRB's

website.  The Public Hearing Notice for the November 4, 2020 DRB Meeting provided further

Public Notice of the Abandonment Appeal.[20]  BTC subsequently filed an Application to Amend

Permit 17-0662CA/MA (Permit Amendment Application No. 21-0414CA/MA 75 Cherry Street)

and subsequently withdrew the Abandonment Appeal.  Compl. ¶31.

The Public Hearing Notice for the March 3, 2020 DRB Hearing provided public notice of

BTC's Application to Amend Permit 17-0662CA/MA.[21]  As an adjacent property, 100 Bank was

specifically notified by a mailing to 100 Bank providing notice in addition to the Public Hearing

Notice of the DRB's upcoming March 3, 2021 hearing on the amended permit.  **Exhibit D**.  100

Bank's attorney, Matt Byrne, Esq., was not provided separate notice,[22] as there was no

requirement to do so.  Compl. ¶ 47.  Nonetheless, 100 Bank's attorney obtained notice from the

DRB website, in addition to that which had already been sent to his client.  Id.

100 Bank participated in the DRB process with several Public Comments.  These include

the following letters from 100 Bank's counsel of record, which are included in the materials

posted on the DRB webpage under supporting documents: (1) March 2, 2021 Letter to

---

[19] Received by Burlington Permitting & Inspection on October 1, 2020.
https://www.burlingtonvt.gov/sites/default/files/Agendas/SupportingDocuments/75%20cherry059753%20%281
%29.pdf (last visited July 4, 2021).

[20] https://www.burlingtonvt.gov/sites/default/files/Agendas/2020%20110420%20PH.pdf (last visited July 4, 2021).

[21] https://www.burlingtonvt.gov/sites/default/files/Agendas/2021%20030321%20PH.pdf (last visited July 4, 20201).

[22] 100 Bank's Due Process claim alleging "failure to provide notice of relevant proceedings," Compl. ¶ 98, is
premised on this distinction – 100 Bank received notice.  Its attorney received notice from the public portal for
DRB information.  Its attorney did not receive a personal letter, which appears to be the basis for his issue.

Downs
Rachlin
Martin PLLC

Defendants DRB and Scott Gustin; (2) November 20, 2020 Letter to Defendants DRB and

Gustin; and (3) October 30, 2020 Letter to Defendant Gustin (collectively, **Exhibit E**).[23]

### C.  100 Bank's Environmental Court Appeal Of The Permit.

On March 23, 2021, 100 Bank appealed the March 8, 2021 DRB approval.  On May 10,

2021, 100 Bank submitted more than 100 issues for the Court on appeal.  See V.R.E.C.P. 5(f).

100 Bank's issues include, among many others:

> 1.  May BTC obtain an amendment to a permit that it expressly
> abandoned….

> 11. Did the Board approve a Project that made changes to 100
> Bank's property knowing the Applicant did not have the consent of
> 100 Bank to make those changes….

> 12. Was 100 Bank denied statutorily and constitutionally required
> notice of the proper proceeding to consider the issue raised by 100
> Bank….

> h. Was the failure to provide notice of an appeal of a
> decision related to the abandonment of the permit a violation of 24
> V.S.A. § 4464 and the requirements of the United States and
> Vermont Constitutions?

> i.  Was 100 Bank provided with notice of which of the
> many proceedings that the DRB was actually going to make
> decisions about the Project?

> j.  Did the DRB violated 2.4.8 of the CDO by refusing to
> consider 100 Bank's arguments concerning the Project?

> k. Did the DRB violated Section 2.4.8 of the CDO by
> failing to provide a copy of its decisions to 100 Bank?

---

[23] The letters from 100 Bank are available as Public Comments at
https://www.burlingtonvt.gov/sites/default/files/Agendas/SupportingDocuments/DOC%231632306-v1-Gustin%20and%20DRB%20re%2075%20Cherry%20Street.PDF (last visited July 4, 2021).
100 Bank's Complaint misleadingly asserts that 100 Bank did not receive notice of BTC's amended application.
The Public Comments clearly demonstrate 100 Bank was fully aware of the amendment. 100 Bank's concern
appears to be that notice was sent to 100 Bank, not 100 Bank's attorney.  In addition, the DRB's hearing, the
Design Advisory Board's and Conservation Board's agendas to consider the subject amendment application
were all published on the City's website and in at least three separate locations within the City.

Downs
Rachlin
Martin PLLC

l. Did the DRB and the Administrative Officer violate the requirements of 24 V.S.A. § 4464 and the requirements of the United States and Vermont Constitutions by failing to provide 100 Bank's attorney with notice of the various actions described above after he specifically requested notice?

100 Bank's Amended Statement of Questions at 1, 17-18, Case No. No. 21-ENV-00022. On May 17, 2021, the court held a status conference in the permit appeal at which 100 Bank expressed its two fundamental complaints: the March 8, 2021 DRB approval fails because 1) BTC's application to modify Zoning Permit 17-0662CA/MA was not co-signed by 100 Bank; and 2) BTC cannot have a zoning permit for 100 Bank's property. See Hearing Tran. 11:10-22; 13:3-23; 17:13-25, attached as **Exhibit E**. The Environmental Court informed the parties that while it had jurisdiction to determine the validity of the permit, it did not have jurisdiction to resolve a disputed property right.[24] This case, and the identical parallel State Court Case followed.

### D. 100 Bank's Other Litigations

On August 12, 2020, 100 Bank filed suit against BTC and its related entities alleging breach of easement and trespass claiming that BTC trespassed on its property when it demolished the mall neighboring 100 Bank and substantially interfered with 100 Bank's use and enjoyment of its property (the "Property Damage Case"). See Complaint attached as **Exhibit G**. The City is not a party to that litigation. Many of the allegations in the Property Damage Case are virtually identical to statements made by 100 Bank's principal, Erik Hoekstra, in the Affidavit Mr. Hoekstra submitted with the Motion for Preliminary Injunction in the State Court Action. Litigation in the Property Damage Case is ongoing.

---

[24] From the City's perspective, there is no disputed property right. 100 Bank currently owns the property. The parties are discussing how the City can acquire that right, so that the Public Improvement can be built. 100 Bank's issue is more appropriately characterized as a dispute as to the legal effect of a permit that concerns its property.

Downs
Rachlin
Martin PLLC

On June 9, 2021, the same day the instant action was filed, 100 Bank filed the parallel State Court Action.  The only difference between the two cases is that a) this case seeks relief under the United States Constitution rather than the state analogs pled in the State Court Action; and b) 100 Bank filed a Motion for Preliminary Injunction in the State Court Action.[25]  On June 25, 2021, the City and BTC each filed Oppositions to 100 Bank's Motion for Preliminary Injunction.  Motions to Dismiss in the State Court Action will be filed on or before July 20, 2021.  A merits hearing is scheduled in the Environmental Court for Fall 2021.

II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(1), a claim may be dismissed for lack of subject matter jurisdiction if the district court lacks the statutory or constitutional power to adjudicate it.  Makarova, 201 F.3d at 113.  "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court… may refer to evidence outside the pleadings….  A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  Id.

When presented with a Rule 12(b)(1) Motion to Dismiss, a district court must distinguish between two types of challenges to subject matter jurisdiction. "A facial challenge contests the sufficiency of the pleadings….  A factual attack, by contrast, 'challenge[s] whether sufficient facts exist for the court to determine that it has jurisdiction to hear the plaintiff['s] claims.'….  In a factual challenge…no presumptive truthfulness attaches to the complaint's jurisdictional allegations…."  Tasini v. New York Times Co., 184 F. Supp. 2d 350, 353 (S.D.N.Y. 2002) (quoting Greater New York Hospital Assoc. v. United States, No. 98 Civ. 2741, 1999 WL 1021561, at *4 (S.D.N.Y. Nov. 9, 1999) (Carter, J.)).

---

[25] 100 Bank's claims for relief in the instant action seek injunctive and declaratory relief.  Those issues are currently pending in the State Court Action.

Downs
Rachlin
Martin PLLC

"To be justiciable, a cause of action must be ripe—it must present a real, substantial controversy, not a mere hypothetical question." Kurtz v. Verizon New York, Inc., 758 F.3d 506, 511 (2014) (holding district court lacked subject matter jurisdiction because takings claim and due process claim, arising from same circumstances as takings claim, were not ripe for review). "Land use challenges, whether pursued as a takings claim under the Fifth Amendment or as violations of equal protection or due process, are subject to the ripeness requirement articulated in Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)." Ferncliff Cemetery Ass'n v. Town of Greenburgh, New York, 834 F. App'x 665, 666 (2d Cir. 2021).

Additionally, a district court has discretion to decline to exercise subject matter jurisdiction under certain circumstances. First, a federal court may abstain when a parallel state court proceeding exists. Chandler v. Sorrell, No. 1:07-CV-251, 2008 WL 2166058, at *3 (D. Vt. May 21, 2008) (citing Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 818, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976)). Abstention is also proper where the case may be disposed of by a state court on state law grounds. Barker v. Ripley, 921 F. Supp. 1213, 1216 (D. Vt. 1996) (citing Railroad Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)); see Cucamongans United for Reasonable Expansion ("CURE") v. City of Rancho Cucamonga, 210 F.3d 382 (9th Cir. 2000) ("Land use planning is a sensitive area of social policy that meets the first requirement for Pullman abstention."). "Declining jurisdiction in light of parallel or duplicative state court proceedings is in 'the interests of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" Chandler, 2008 WL 2166058, at *3 (internal quotations omitted).

Even with a facial challenge under 12(b)(1), or an attack under Rule 12(b)(6), "a

plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (pleading standard of Rule 8 "demands more than an unadorned, the-

defendant-unlawfully-harmed-me accusation"). "Nor does a complaint suffice if it tenders

'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (quoting

Twombly, 550 U.S. at 557). Moreover, a plaintiff must be able to allege "enough facts to state a

claim to relief that is **plausible on its face**."[26] Twombly, 550 U.S. at 570 (emphasis added);

Ciccotelli v. Deutsche Bank AG, No. 15-cv-105, 2016 WL 2588169, at *2-5 (D. Vt. May 4,

2016), aff'd, 701 F. App'x 67 (2d Cir. 2017) (citing Iqbal and dismissing claims for lack of

plausibility). The U.S. Supreme Court has defined the plausibility standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual
> content that allows the court to draw the reasonable inference that
> the defendant is liable for the misconduct alleged. The
> plausibility standard is not akin to a "probability requirement,"
> but it asks for more than a sheer possibility that a defendant has
> acted unlawfully. Where a complaint pleads facts that are "merely
> consistent with" a defendant's liability, it "stops short of the line
> between possibility and plausibility of 'entitlement to relief.'"

Iqbal, 556 U.S. at 678 (citing Twombly throughout); Nashef v. AADCO Medical, Inc., 947 F.

Supp. 2d 413, 417 (D. Vt. 2013) ("the court must determine whether the 'well-pleaded factual

allegations . . . plausibly give rise to an entitlement to relief,'" but "the court need not credit

---

[26] The Court's inquiry in deciding a motion to dismiss includes any attachments to the Complaint, and any
documents incorporated in the complaint by reference or integral to it, as well as to reasonable factual inferences and
matters the Court may judicially notice. Yung v. Lee, 432 F.3d 142, 146 (2d Cir. 2005) ("In addition to the
allegations in the complaint, we also consider on a Rule 12(b)(6) motion 'any written instrument attached to [the
complaint] as an exhibit,' 'any statements or documents incorporated in it by reference,' and any document not
incorporated but that is, nevertheless, 'integral' to the complaint because the complaint 'relies heavily upon its terms
and effect.'"); Chambers, 282 F.3d at 153.

'legal conclusions' or '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements'") (quoting <u>Iqbal</u>, 556 U.S. at 664, 678); <u>Vt. Hard Cider Co. v. Ciolek</u>, No. 11-cv-150, 2012 WL 761304, at *2-3 (D. Vt. Mar. 7, 2012) (citing <u>Twombly</u> and <u>Iqbal</u> and dismissing claims due to "factual inadequacies" of pleadings).

## III.    LEGAL ARGUMENT

### A.    100 Bank's Fifth Amendment Takings Claim Under § 1983 Is Not Ripe And Must Be Dismissed.

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amend. V.  Plaintiff does not allege a taking involving physical invasion of the property.  "The hallmarks of a physical taking are absolute exclusivity of the occupation, and absolute deprivation of the owner's right to use and exclude others from the property…."  <u>Killington, Ltd. v. State</u>, 164 Vt. 253, 259, 668 A.2d 1278, 1282 (1995) (internal quotations omitted).  Neither of these requirements is met.

Instead, Plaintiff alleges a taking "through official policies…," Compl. ¶ 112, specifically, "through the[] various decisions and actions [of] Mr. Gustin, the DRB Defendants, and BTC…." Compl. ¶ 111.  More specifically, 100 Bank claims that by approving the plan for the Pine Street Extension, the DRB has ordered a permanent physical invasion of its property. <u>See</u> Pl's Moton for Preliminary Injunction in the State Court Action, **Exhibit H** at 10.

100 Bank's claim effectively seeks relief under the theory of inverse condemnation. "Inverse condemnation is a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant….  [It] stands in contrast to direct condemnation, in which the government initiates proceedings to acquire title under its eminent domain authority."  <u>Knick v. Twp. of Scott, Pennsylvania</u>, 139 S. Ct. 2162, 2168, 204 L. Ed. 2d 558 (2019)

Also known as a regulatory taking, inverse condemnation "occurs when the purpose of government regulation and its economic effect on the property owner render the regulation substantively equivalent to an eminent domain proceeding and, therefore, require the government to pay compensation to the property owner." Southview Assocs., Ltd. v. Bongartz, 980 F.2d 84, 93 n.3 (2d Cir. 1992).

### 1. The DRB Does Not Have Eminent Domain Authority And Approval By The DRB Does Not Result In the Loss Of Property Interest.

As a threshold matter, there is no dispute between the parties that the DRB has no condemnation authority. See **Exhibit H** at 11. Plaintiff, however, appears to argue that DRB approval—on its own—impacts the rights of owners of the underlying property associated with the proposed development.

The actions of the DRB on its own are not governmental or zoning regulations. The DRB is a quasi-judicial board that has the power to review applications and administer the provisions of the Comprehensive Development Ordinance ("CDO"). See CDO Sec. 2.4.4; 24 V.S.A. § 4460. The decision of the DRB may be appealed to the Environmental Court, as 100 Bank has done in this matter. See CDO Sec. 12.2.3. This process is the exclusive remedy for 100 Bank to challenge the validity of the DRB Permit. Id. at 12.2.4. Accordingly, the issuance of the permit, distinct from an enactment of a municipal regulation, does not give rise to a claim of illegal taking.

Furthermore, there is no requirement that a permit applicant own the property on which the proposed development will take place. Devonwood Investors, LLC 75 Cherry Street, 2017 WL 11272330 at *4. Vermont law is also clear that approvals or denials of a zoning permit do not affect the legal property rights of underlying property owners. See e.g., Blanche S. Marsh Inter Vivos Tr. v. McGillvray, 2013 VT 6, ¶ 19, 193 Vt. 320, 329–30, 67 A.3d 943, 949 (2013)

Downs
Rachlin
Martin PLLC

(explaining "the difference between the issuance (or denial) of a zoning permit pursuant to applicable zoning regulations and enforcement of private property rights…. The two matters are distinct."); Nordlund v. Van Nostrand, 2011 VT 79, ¶ 13, 190 Vt. 188, 193, 27 A.3d 340, 343 (2011) (zoning decision does not affect the underlying property rights held by landowners); see also 34 Fitzsimonds Rd 3-Lot Subdivision, No. 68-6-18 VTEC, 2019 WL 2568105, at *8 (Vt.Super. Apr. 25, 2019). "[I]t is well established that municipal actions that impede a party's use of property do not necessarily rise to the level of a taking requiring payment." (citing Dolan v. City of Tigard, 512 U.S. 374, 384-85 (1994))).

The DRB Permit has been approved with release of the permit subject to preconditions. At this time, the permit has not been released, and neither BTC nor the City has taken any action in 2021 with respect to 100 Bank's portion of the underlying property.[27] They have no future plans to do so unless they obtain the legal right to the property, lest they rightfully be subject to trespass claims. That is not to say that the City does not intend to obtain the legal rights to 100 Bank's 2005 square feet. The parties are working towards that and 100 Bank will be entitled to compensation. However, 100 Bank's piecemeal lawsuit strategy will not have any impact on that compensation, or impede the public interest objectives of the Public Improvements.

The DRB's approval and the zoning permit have no impact on 100 Bank's current use and enjoyment of its property. To the extent 100 Bank claims otherwise, that has to do with its property damage and trespass claims arising out of BTC's 2018 conduct, not the current amendment in the wake of the Amended and Restated Development Agreement. Moreover, no property has been seized, no use enjoined, and absolutely no ownership rights have been reduced or transferred away from 100 Bank. Accordingly, the requested relief must be denied.

---

[27] In 2018, 100 Bank demolished the mall adjacent to 100 Bank's property based on the 2017 approval. This dispute concerns the approved amendment to the 2017 permit.

Downs
Rachlin
Martin PLLC

## 2. The Takings Claim Is Not Ripe For Review.

Even assuming the DRB could condemn property, the United States Supreme Court has made clear that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Williamson Cty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 186, 105 S. Ct. 3108, 3116, 87 L. Ed. 2d 126 (1985) (overruled in part by Knick, 139 S. Ct. at 2162); Sagaponack Realty, LLC v. Vill. of Sagaponack, 778 F. App'x 63, 64 (2d Cir. 2019) ("Knick leaves undisturbed the first prong [of Williamson], that a state regulatory agency must render a final decision on a matter before a taking claim can proceed.").

The recent case of Wilson v. Twp. of W. Amwell, No. CV1916039MASLHG, 2021 WL 1699944, at *1 (D. N.J. Apr. 29, 2021), is instructive. Wilson was a post-Knick Section 1983 action alleging a taking without just compensation in violation of the Fifth Amendment arising out of a litigation settlement agreement between the defendant Township and a fair housing organization. The Township agreed in the settlement to "secure title to [Plaintiffs'] site, Block 8, Lot 51 [and] transfer title to Habitat for Humanity for the construction of 4 units as soon as clear title for the property is secured." Id. at *1-2. Plaintiff filed suit claiming that the Township's designation of its property for acquisition to fulfill the terms of a settlement agreement—which the Township acknowledged may occur through a future condemnation action—was a regulatory taking. Id. at *2. The District Court dismissed the claim as not ripe:

> It is undisputed that Defendant has taken no action with respect to Plaintiffs' property…. The plan to acquire the Property outlined in the settlement agreement did not amount to a final decision to acquire the Property…. The mere designation of the Property as a target for potential acquisition by Defendant is not a final decision as to the Property. While the municipality has announced that it

> "*intends* to construct" affordable housing on the site…these 'some
> day' intentions do not show that condemnation of Plaintiff's
> property is imminent

Id. at *4-5.   In dismissing the claim, the District Court cited approvingly another decision

dismissing a similar action on ripeness grounds for lack of finality where a "municipality

informed [a] plaintiff that it intended to acquire the [plaintiff's] property by negotiated sale

and/or condemnation and transfer the property to the private redeveloper….." Id. at *4 (quoting

RLR Invs., LLC v. Town of Kearny, No. 06-4257, 2007 WL 1797658, at *3 (D.N.J. June 20,

2007)).   In that case, the District Court rejected the takings claim because the municipality had

not yet condemned the property by filing a condemnation complaint or passing an ordinance

authorizing condemnation.   In both cases, the intent to acquire private property through a

negotiated sale or through a future condemnation act was insufficient on its own to satisfy the

finality requirement of Williamson.

Here, Defendants have no plans to develop 100 Bank's property without first acquiring

from 100 Bank the right to do so.   100 Bank is well aware of this and has been in negotiations

with BTC to that effect.   No condemnation action has been filed, and the DRB permit approval

does not, itself, authorize a condemnation.   Moreover, 100 Bank is currently litigating the DRB

Permit in Environmental Court, Case No. 21-ENV-00022.   Until the Environmental Court

resolves that question and the other issues before it challenging the DRB Permit, there is no final

decision on the permit.   Thus, even assuming the permit could have the force and effect of a

government regulation (which it does not), there is no final decision on which to claim a taking

and no condemnation proceeding on file.   Accordingly, the claim is premature and fails as a

matter of law.   See Knick, 139 S. Ct. at 2169; Kurtz v. Verizon New York, Inc., 758 F.3d 506,

512 (2d Cir. 2014) ("The finality requirement also helps to develop a full record for review,

Downs
Rachlin
Martin PLLC

limits judicial entanglement in constitutional disputes, and gives proper respect to principles of federalism.").

### 3. 100 Bank's Claims For Violation of Due Process And First Amendment Access To The Court Are Subject To *Williamson* Ripeness Requirement.

Plaintiff's claims alleging violations of due process and access to the courts arise under the same facts as its takings claim. Accordingly, the <u>Williamson</u> finality analysis applies. <u>Kurtz</u>, 758 F.3d at 516. "Applying *Williamson County* more broadly to these due process claims confers other benefits. It prevents evasion of the ripeness test by artful pleading of a takings claim as a due process claim." <u>Id.</u> Because the takings claim is not ripe, Plaintiff's other claims arising from the same nucleus of facts are premature and must be dismissed on ripeness grounds. <u>Id.</u>

### B. 100 Bank's Complaint Fails To State Any Viable 1983 Claim.

Section 1983 provides, in relevant part:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983. Thus, in order to prevail on a claim against the City under Section 1983, 100 Bank must prove (1) an action taken under the color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the City caused the constitutional injury. <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 692, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978). "Where a plaintiff seeks to hold a municipality liable for a 'single decision by [a] municipal policymaker[ ],'...the plaintiff must show that the official had final policymaking power. <u>Roe v. City of Waterbury</u>, 542 F.3d 31, 37 (2d Cir.

2008).  "Whether an official has final policymaking authority is a legal question, determined on the basis of state law."  Id.

With respect to Count I and II, 100 Bank claims constitutional injury by virtue of (1) the O'Neil Memorandum and the legal advice of the City Attorney's Office'; (2) its allegation that the DRB failed to provide notice of the relevant proceedings; (3) the March 8, 2021 DRB Findings; (4) the September 14, 2020 Email; and (5) other unspecified "official policies".[28]

As an initial matter, "[t]he mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference," Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995).  Furthermore, Ms. O'Neil and the City Attorney's Office do not have "final policymaking power" for the permit as required for a claim under Section 1983. Roe, 542 F.3d at 37.  See the Comprehensive Development Ordinance ("CDO") at Sec. 2.4.4 (outlining the powers and duties of the DRB); 24 V.S.A. § 4460.

Finally, with respect to Count III, 100 Bank claims that Mr. Gustin's September 14, 2020 Email violated 100 Bank's access to the Court by "failing to provide a copy of the Gustin decision on the Abandonment Letter" and preventing 100 Bank from "us[ing] BTC's own position to persuade the DRB that BTC had abandoned, withdrawn, and relinquished its permit." Compl. ¶¶114, 117.  However, the email from Mr. Gustin was not a decision on a permit requiring notice under CDO or the Vermont Planning and Development Act.  Moreover, BTC did not accept that decision, and filed its own appeal (the "Abandonment Appeal") with the DRB, which was subsequently noticed on the DRB's website and posted in three (3) places

---

[28] 100 Bank attempts to circumvent its pleading deficiencies by stating that these so-called official policies are "described elsewhere in the Complaint."  Compl. ¶98.  The only "official policy" referenced in the Complaint is the September 14, 2020 Email and notice thereof (Compl. ¶¶27, 35).

within the City.  BTC subsequently filed an Application to Amend Permit 17-0662CA/MA and

later withdrew the Abandonment Appeal.  Thus, the Abandonment issue, to the extent there was

one, is fully moot and the allegation does not establish a plausible claim against the City

### C.  The Claims Against The City Officials In Their Official Capacity Are Duplicative Of  The Claims Against The City And Must Be Dismissed.

100 Bank named eight (8) City Officials in the Complaint in their "official capacity."

There are no individual capacity claims.  "Official-capacity suits generally represent only

another way of pleading an action against an entity of which an office[ial] is an agent[.]"

Monell, 436 U.S. at 691 n.55.

"It is now well accepted that [1983] suits against officers acting in their official capacities

are simply another way of pleading an action against a governmental entity."  Hee v. Everlof,

812 F. Supp. 1350, 1351 (D. Vt. 1993) (citing Brandon v. Holt, 469 U.S. 464, 472, 105 S.Ct.

873, 878, 83 L.Ed.2d 878 (1985) (recognizing distinction "between suits against government

officials 'in their individual capacities' on the one hand, and those in which 'only the liability of

the municipality itself was at issue,' [i.e., official capacity] on the other."));  Coon v. Town of

Springfield, Vt., 404 F.3d 683, 687 (2d Cir. 2005) ("[A] § 1983 suit against a municipal officer

in his official capacity is treated as an action against the municipality itself.").  Because the DRB

can only act through the City Officials, and the DRB (as will be discussed below) does not have

the capacity to be sued, the City, not its officials, is the properly named party in a case asserting

1983 claims against City Officials acting in their official capacity.  Id.[29]

---

[29] If these were individual capacity claims, which they are not, the officials would also be entitled to qualified immunity dismissing the claims against them.  In addition, 24 V.S.A. § 901 requires actions against appointed or elected municipal officers to be brought in the name of the town: "If the action is given against such officers, it *shall* be brought against such town…."; see Fed. R. Civ. P. 17(b).  "Indeed, the sparse case law on § 901 supports the view that the purpose of the statute is to 'require that suits against [City Officials] who were acting in their official capacities be brought against the municipality."  Coon, 404 F.3d at 687.

Downs
Rachlin
Martin PLLC

**D.  The DRB Is a Municipal Department And Does Not Have The Capacity To Sue Or Be Sued.**

It is well settled law that municipal departments such as a Development Review Board or police department are not separate legal entities and do not have the capacity to sue or be sued under 42 U.S.C. § 1983.  Wyatt v. City of Barre, 885 F. Supp. 2d 682, 688 (D. Vt. 2012) (dismissing claims against municipal department under well-settled law and concluding that municipal department should not have been included in the case caption); Ekberg v. City of Burlington, No. 1:08-CV-219, 2009 WL 1789284, at *6 (D. Vt. June 23, 2009) (granting motion to dismiss claim against municipal department).  "[A] municipal department enjoys 'no greater separate identity' from the municipality than would an official acting in his official capacity."  Hee, 812 F. Supp. at 1351.  Accordingly, the claims against the DRB must be dismissed.

**E.  Alternatively The Court Should Decline To Exercise Jurisdiction And Abstain In Light Of The Parallel State Court Action And Pending Permit Appeal In the Environmental Division.**

"Generally, federal courts should avoid making unnecessary constitutional decisions." OMYA, Inc. v. Vermont, 80 F. Supp. 2d 211, 216 (D. Vt. 2000).  Under that principle, the Pullman abstention doctrine is triggered when a federal constitutional issue may be avoided or modified by a state court determination of a state law.  Id.; Rapid Rubbish Removal, Inc. v. Ripley, 988 F. Supp. 414, 418 (D. Vt. 1997).  Application of the Pullman doctrine is appropriate where "th[e] dispute involves a controlling, unsettled issue of state law.  Second, resolution of the state law issue could eliminate the need to adjudicate federal claims.  Third, the state law is capable of being construed in such a way as to dispose of or modify the federal question." Rapid Rubbish Removal, Inc., 988 F. Supp. at 418.

The facts of this case satisfy the Pullman doctrine's three criteria.  Here, there is a pending permit appeal in the Environmental Division of the Vermont Superior Court.  The

Environmental Court's decision in that appeal could resolve, reduce, or modify Plaintiff's issues in the present litigation.  In light of that pending matter, the Court should at a minimum abstain from deciding the federal constitutional issues raised in Plaintiff's Complaint.  See id.; Thinh Tran v. Dep't of Plan. for Cty. of Maui, No. CV 19-00654 JAO-RT, 2020 WL 3146584, at *7, 9 (D. Haw. June 12, 2020) (abstaining under the *Pullman* doctrine from deciding Fifth Amendment claims in a takins case, because "the resolution of state/municipal issues here can avoid or narrow the adjudication of the federal constitutional issues" and "Knick has not affected the Court's ability to apply Pullman."

<u>CONCLUSION</u>

WHEREFORE, the City Defendants respectfully request that the Court Dismiss the Complaint.

Burlington, Vermont                    July 6, 2021

                                       DOWNS RACHLIN MARTIN PLLC


                                       By:    /s/ Jennifer E. McDonald
                                              Jennifer E. McDonald
                                              199 Main Street
                                              P.O. Box 190
                                              Burlington, VT 05402-0190
                                              Telephone:  802-863-2375
                                              Fax:  802-862-7512
                                              E-Mail:  jmcdonald@drm.com

                                              ATTORNEYS FOR DEFENDANTS
                                              THE CITY OF BURLINGTON; THE
                                              BURLINGTON DEVELOPMENT
                                              REVIEW BOARD; CAITLIN
                                              HALPERT; in her official capacity;
                                              BROOKS McARTHUR, in his official
                                              capacity; SEAN McKENZIE, in his
                                              official capacity; BRADFORD L.
                                              RABINOWITZ, in his official
                                              capacity; HARRIS SPRINGER, in his
                                              official capacity; SCOTT GUSTIN, in
                                              his official capacity

20744964.1

Downs
Rachlin
Martin PLLC